No. 22,203.

HUGH BLAIR, *Appellee*, v. O. H. MCQUARY, Jr. (J. W. JUN-KINS and ROBERT JUNKINS, Partners, etc., *Appellants*).

#### SYLLABUS BY THE COURT.

1. PROMISSORY NOTE—*Contemporaneous Conversations Cannot Vary Obligations of Note.* The rule is once more followed that prior or contemporaneous conversations or oral statements cannot be used to overturn or impair the obligations of a promissory note or its indorsement.

2. SAME—*Demurrer to Evidence Properly Sustained.* It was not error to sustain a demurrer to the defendants' evidence.

Appeal from Douglas district court; CHARLES A. SMART, judge. Opinion filed May 8, 1920. Affirmed.

*Edward T. Riling,* and *John J. Riling,* both of Lawrence, for the appellants.

*R. E. Melvin,* of Lawrence, for the appellee.

The opinion of the court was delivered by

WEST, J.: The defendants failed in their attempted defenses to a promissory note and appeal from an adverse judgment.

They had furnished crushed rock to their codefendant, McQuary, to be used in building sidewalks on several pieces of his property in an addition to the city of Lawrence. He owed them $280, as they claim, and when a purpose was expressed to file a lien they allege the plaintiff conspired with McQuary to cheat them and that the plaintiff represented to them that McQuary's credit was good, his note would be worth its face, he was in splendid financial condition, his business was netting him good money, and they would be safe in accepting a note for $250 in full settlement and abandoning their right to a lien on property owned and being built by him with money borrowed of the plaintiff—

"And if they accepted a note of the said O. H. McQuary, jr., it should be taken in plaintiff's name and would be his property, and that they would be held harmless on said note and would look to said O. H. McQuary, jr., for the payment of said note, and not said defendants, J. W. Junkins and Robert Junkins."

They further alleged that, relying on and believing such representations, they permitted the lien time to elapse and accepted a note for $250—

"With the distinct oral understanding with said plaintiff that the said note was the property of the plaintiff herein, and not said defendants, and that as soon as same was presented to said plaintiff he would immediately take said note from the said defendants, paying them the sum of two hundred and fifty dollars."

They further allege that by mistake they took the note to the plaintiff who—

"With the intent to cheat and defraud said defendants, J. W. Junkins and Robert Junkins, instead of having a new note executed in his favor, as was the agreement, falsely and fraudulently represented to the said defendants that they would not bind themselves legally to the payment of said note, if they indorsed the same; that said indorsement would be made by said defendants merely as a matter of accommodation to said plaintiff; that said oral agreement had already been made; that they were not obligating themselves in any way in the execution and indorsement of the said note for its payment, and that if they indorsed said note at the time it would simply be a matter of form."

This seems to have been an amended answer, though whether amended before or after the former decision (100 Kan. 203) we do not know.

At the close of the defendants' evidence the trial court sustained a demurrer thereto, and this is the ruling complained of.

It hardly need be said that all the averments as to promises and specious assurances held out by the plaintiff as soporifics to quiet the defendants' somewhat inflamed reluctance to indorse the note go for naught. Centuries of experimenting with human frailty have caused the law merchant to decree that the execution or indorsement of a promissory note shall bear facial assurance that it means what it says, and that its effect is not to be overturned or subverted by proof of prior or contemporaneous verbal declarations. Otherwise, business could hardly be carried on. A note, like any other written contract, bars consideration of all mere talk which marked or led up to the signing, and yet, this seems to be one of the hardest lessons to learn which the law presents to those who assume to have ability to transact business.

But, as formerly decided, there are averments of wrongful persuasion to forego filing a lien, which demand attention.

The attempted proof of these left things at loose ends. The trial court well observed that, assuming this to be a question for the jury, it was impossible to find a basis for recovery of damages—no evidence of value of lienable property, or as to whether, if there was any, it was clear or encumbered; nothing to indicate that a lien would have brought anything or secured anything. One of the defendants testified that McQuary had abandoned the addition and left some of the houses half completed, and that it was on these houses the plaintiff claimed he had loaned McQuary money. His son testified that Mr. Blair, the plaintiff, thought McQuary was good, and that he had him where he could not get away.

"Q. You told Mr. Blair, or your father did, that you were thinking of filing a lien on some of these properties. A. Yes, sir.

"Q. And he advised you against it, did he? A. Mr. Blair did, yes, sir.

"Q. How did he come to do that? A. I don't know. He says, 'All you need is his note.'

"Q. Yes, all you need was that. Well, did he tell your father that in his opinion it would be extremely hard to make a lien stick under the conditions as your father had given them to Blair? A. I don't remember that."

This also appears in the record:

"Q. Was anything said there that he would give you the money if you wouldn't file the lien, or words to that effect? A. Yes, sir, he did; he said that, yes, sir.

.     .     .     .     .     .     .     .     .     .     .     .     .

"Q. What was said along that line? A. He said that he would look to Mr. McQuary for the money; that he was in good financial condition and had several big deals on.

"Q. What did he say about looking to you folks, if anything, about the payment of it? A. He says, 'I will never look to you for the payment of the note.' That is just what he said."

The son also stated that he has since learned that at the time of the transaction McQuary's financial condition was bad.

Had all the evidence been submitted to the jury, we fail to see how they could have found a basis for assessing damages in favor of the defendants, or relieving them of any part of their written obligations to the plaintiff.

There is no evidence of a conspiracy between Blair and McQuary, and neither is there any showing beyond a mere suspicion that Blair intentionally deceived the defendants as to

McQuary's financial condition, or that they lost anything by failing to file a lien.

In view of the foregoing it remains only to say and to hold that the ruling of the trial court is not shown to have been prejudicially erroneous, and it is therefore affirmed.