No. 25,294.

The Citizens Bank of Lane (J. S. McMahon, Receiver, substituted, *Appellant*), v. The North End State Bank, *Appellee*.

SYLLABUS BY THE COURT.

1. Promissory Note—*Indorsed "Without Recourse"—A Written Contract—Cannot Be Varied by Oral Testimony of Prior or Contemporaneous Parol Contract.* An indorsement of a negotiable promissory note "without recourse" constitutes a written contract whose legal significance is in no need of testimony to interpret it and which cannot be varied by oral testimony of a prior or contemporaneous parol agreement concerning it.

2. Same. Where a bank disposed of its excess loans, evidenced by negotiable promissory notes, by selling and delivering them duly indorsed without recourse to another bank in which it maintained a credit account, and its account was credited therewith, parol evidence was inadmissible to prove an agreement between the banks, prior to such disposition of the notes, that if they were not paid at maturity the indorsee would have the right to charge the notes against the indorsing bank's credit account and return the notes to the indorsee.

3. Same. The case of *Bank v. Bank,* 98 Kan. 563, 159 Pac. 403, distinguished.

Appeal from Sedgwick district court, division No. 2; Thornton W. Sargent, judge. Opinion filed June 7, 1924. Reversed.

*Chester 1. Long, Joseph D. Houston, Austin M. Cowan, Claude I. Depew, James G. Norton, William E. Stanley,* all of Wichita, and *E. F. Abbott,* of Lane, for the appellant; *F. M. Sheridan,* and *B. L. Sheridan,* both of Paola, of counsel.

*Otto R. Souders,* and *Clyde E. Souders,* both of Wichita, for the appellee.

The opinion of the court was delivered by

Dawson, J.: The Citizens Bank of Lane brought this action to recover a sum of money which it claimed to have on deposit in the North End State Bank of Wichita.   It alleged that in the spring of

1921, March 26 and May 14, it sold and delivered to defendant two promissory notes of one William C. White for $3,500 each, which it had duly indorsed without recourse, and that immediately on receipt of these notes the defendant bank gave the plaintiff credit for the face value thereof in its reserve account maintained in defendant's bank; but that on September 26, 1921, the defendant, without authority or right, charged the amount of these notes to plaintiff's bank account and attempted to return the notes to plaintiff, and that defendant had at all times thereafter refused plaintiff's demand for the payment of the full amount of its reserve deposit account in defendant's bank.

The defendant bank's answer, among other matters, alleged that for some time prior to March 26, 1921, the plaintiff and defendant had made and entered into an oral agreement, by the terms of which each bank was to carry for the other certain loans in excess of the amounts permitted by the banking laws, and for the purpose of each accommodating the other and to enable them both to better accommodate their customers:

"That by the terms of the said agreement, when a customer of one of the banks had borrowed all the said bank could loan him under the banking laws, and still desired further credits, the bank with which he was doing business was to indorse the notes already held, or new ones obtained, to the other bank under this agreement, and to sign the same 'without recourse.' It being fully understood and agreed that the said signature would not in any measure relieve the liability of the selling bank. As further consideration for the said agreement, money was to be loaned at 8 per cent to the borrower and to be carried by the other bank at the rate of 6 per cent, so that the bank making the indorsement would receive interest at the rate of two per cent and would carry it with the other bank at the rate of 6 per cent. That many notes were carried by each bank in the same manner for the other bank under the terms of the said agreement."

Defendant further answered that the two notes of William C. White for $3,500 each were received by it pursuant to such oral agreement and custom, and that at their maturity they were charged back against the plaintiff bank's reserve account and mailed back to the indorsing bank with a statement showing the charge against plaintiff's reserve account:

"That upon the maturity of the said White notes the defendant bank did charge against the account carried in its bank by the plaintiff the amount of the said note with interest at 6 per cent and mailed the said notes to the plaintiff bank with a statement as to what had been done. That the plaintiff bank attempted to collect the said notes and interest at 8 per cent with the

Bank v. Bank.

intention of retaining the entire amount of principal and interest at 8 per cent, but were unable to collect the said notes and interest. That the said action was in direct compliance with the terms of the said agreement and directly according to the regular custom followed between the two said banks. That thereafter the plaintiff demanded the defendant bank should pay the amount of the said notes, although admitting at the same time that the action of the defendant bank had been in compliance with the said agreement and the said custom between the said banks, but gave as a reason for attempting to set the said agreement aside that the plaintiff bank was in hard financial condition and needed the money more than the defendant bank and that the president of the defendant bank, who was also a stockholder in and vice president of the plaintiff bank, would lose more money by having the loss borne by the plaintiff bank than by the defendant bank. That thereupon the said president of the defendant bank insisted that the plaintiff bank live up to the terms of the agreement irrespective of the loss to him personally, and on behalf of the defendant bank refused to pay the said amounts and demanded the plaintiff live up to the said agreement. That under the terms of the said agreement the defendant bank was not and is not in any measure indebted to the plaintiff."

There was sufficient oral evidence, although of challenged competency, to establish the material allegations of the defense pleaded. The jury returned a verdict for defendant, and answered two special questions, one of which related to an implied contract and was set aside by the court. The other reads:

"1. Did the plaintiff and defendant banks make an express oral agreement about March or April, 1918, by which the bank that indorsed a note to the other bank without recourse promised to take it back in case it should not be paid at maturity, and that the indorsing bank's account should be charged with the amount of said note with interest? Ans. Yes."

Judgment was entered for defendant. Plaintiff appeals, assigning various errors, which all center about the question whether the ordinary legal effect which attaches to the transfer, sale and delivery of a negotiable-instrument duly indorsed "without recourse" may be modified or nullified by proof of an oral agreement that if it were not paid at maturity the indorsee had the right to return it to the indorser and charge the latter with its face value. The plaintiff contends that the indorsements of the notes without recourse were complete written contracts which could not be varied by parol evidence of a prior oral agreement that the plaintiff bank should be liable on the notes, if not paid by the maker, regardless of the recitals of the indorsements.

In support of this contention the rule of the negotiable-instrument act, which declares that a qualified indorsement, such as

20—116 Kan.

"without recourse," renders the indorser a mere assignor of the title, is cited. (R. S. 52-409.) But long before the adoption of the negotiable-instruments act the legal significance of such an indorsement was understood. In the early case of *Doolittle v. Ferry*, 20 Kan. 230, where the action was against indorsers of a negotiable promissory note, the defense successfully maintained in the trial court was that there had been a parol agreement between the plaintiff and themselves that their indorsement of the note was not to charge them as indorsers, but was for the sole purpose of transferring the title to the note. But this court declared that the negotiation of commercial paper by indorsement constitutes a contract as full and complete as if all its well-known terms had been written out in full, setting forth exactly the promises and obligations which the law implies. It was said:

"The law gives to an indorsement a twofold force. It operates to transfer title; it is the assumption of a conditional liability. If an absolute liability is desired, apt words are well known, and in common use. A waiver of notice and protest, written above the indorsement, will make the liability certain— the liability of a surety, it may be, but still a fixed and certain liability on the instrument." (p. 232.)

As to indorsements without recourse the court said:

"If a transfer of title without assumption of liability is sought, equally apt and well-known words are at hand. 'Without recourse' relieves the indorser. Where the law furnishes such apt, brief and well-known expressions for making the indorsement accomplish exactly what the parties may desire, wise policy demands that each form of indorsement should conclusively carry with it the liability which it implies. There are no instruments concerning which it is more important that the rules should be clear, settled and conclusive than negotiable paper. Such paper subserves an invaluable purpose in business transactions, and should tell upon its face the whole story of its obligations. Where for convenience, and to facilitate business, certain short forms and expressions are used, to which the law has attached certain implications, those implications should be as conclusive upon all the parties as though the full contract were reduced to writing." (p. 232.)

In *Challiss v. McCrum*, 22 Kan. 157, this court recognized that an indorsement, "without recourse, W. L. Challiss," constituted a written contract. The court said:

"Of course no action will lie on the indorsement, for by his written contract Challiss expressly declines to assume the liabilities of an indorser. If sustainable at all, it must be as against him as a vendor, and not as an indorser, and upon the doctrine of an implied warranty. . . . It is clear that the character of the indorsement cuts no figure in the question; as stated, no action will lie on it. But, further, the restriction is only as to his liability as indorser,

and in no manner affects his relation to the paper as vendor. An unqualified indorsement is the assumption of a conditional liability. The indorser becomes a new drawer, and is liable on the default of the drawee. 'Without recourse' does away with this conditional liability. It leaves the indorsement simply as a transfer of title, and the indorser liable only as vendor; yet it leaves him a vendor, and divests him of none of the liabilities of a vendor. It makes the transaction the equivalent of a delivery of paper payable to bearer, and transferable by delivery. (*Hannum v. Richardson*, 48 Vt. 508.) Independent, therefore, of any matter of indorsement, what implied warranty is there in the transfer of a promissory note? Two things are clear under the authorities: First, that there is an implied warranty of the genuineness of the signatures; and second, that there is no warranty of the solvency of the parties." (pp. 160, 161.)

In *Cross v. Hollister*, 47 Kan. 652, 28 Pac. 693, where the indorsement of the note was "without recourse," it was held that—

"In an action on such a note, so indorsed, and where there is no fraud or mistake in the transfer, parol proof contradicting the indorsement, or which would change it from a conditional to an unconditional transfer, is not admissible." (Syl. ¶ 2.)

In *Investment Co. v. Gamble*, 102 Kan. 791, 171 Pac. 1152, it was held that—

"A claim by the payee and indorser of certain negotiable promissory notes, that it was orally agreed that if she sold the notes for fifty cents on the dollar—which she did—she would never be called on to pay or be held responsible, is a variance from the written indorsement and constitutes no defense." (Syl. ¶ 1.)

In *Blair v. McQuary*, 106 Kan. 710, 189 Pac. 746, where the legal effect of an indorsement of a promissory note was discussed, the court said:

"It hardly need be said that all the averments as to promises and specious assurances held out by the plaintiff as soporifics to quiet the defendants' somewhat inflamed reluctance to indorse the note go for naught. Centuries of experimenting with human frailty have caused the law merchant to decree that the execution or indorsement of a promissory note shall bear facial assurance that it means what it says, and that its effect is not to be overturned or subverted by proof of prior or contemporaneous verbal declarations. Otherwise business could hardly be carried on. A note, like any other written contract, bars consideration of all mere talk which marked or led up to the signing, and yet this seems to be one of the hardest lessons to learn which the law presents to those who assume to have ability to transact business." (p. 711.)

In 3 R. C. L. 1155, it is said:

"If the transferor of a bill of exchange or promissory note desires to escape the liability expressed by the contract of indorsement, he has available one sure means: by indorsing in the form of a qualified indorsement. The words

'without recourse' accompanying an indorsement clearly indicate that the party making the transfer does not intend to assume the position of an unconditional indorser, or to incur any liability if the note is not paid at maturity upon due demand, or even if all the parties to the paper should prove to be wholly insolvent. No action will lie on the indorsement, for by his written contract the indorser expressly declines to assume the liability of indorser. The indorsement effects a transfer of the title to the paper, without imposing the liability of an indorser. In this particular the negotiable-instruments law declares that 'a qualified indorsement constitutes the indorser a mere assignor of the title to the instrument.'"

See, also, annotations in 2 A. L. R. 216 and 4 A. L. R. 764.

But it is earnestly insisted by the defendant that all this commonplace and familiar law has been superseded, in effect, by the decision in *Bank v. Bank,* 98 Kan. 563, 159 Pac. 403. In that case the Yates Center National Bank had applied to the Northrup National Bank of Iola for a credit account. The Iola bank agreed to furnish it upon the delivery of notes held by the Yates Center bank formally indorsed, and upon two conditions—first, that not less than 25 per cent of the amount of the bank credit thus given should remain on deposit in the Iola bank, and second, that the Iola bank should have the privilege at any time to charge back against the credit account any of the notes found to be unsatisfactory. There was also an agreement, similar to that of the case at bar, touching a division of the interest earned on the notes. But one all-important difference between that case and the present one is that the main features of that agreement were explicitly confirmed by correspondence of virtually contemporaneous date, which though not appearing in the official report is set out at length in vol. 9, Briefs of 98 Kan., Files of State Library, from which we quote:

*Letter from President of Yates Center Bank to President of Iola Bank.*
"October 3d, 1913. . . .
"Referring to our conversation of to-day, I am handing you herewith 22 of our notes amounting to $12,000, proceeds of which you will please place to the credit of this bank on your books. . . .
"My understanding of the result of the agreement between us is that we are to keep on deposit with you at all times not less than 25% of the $12,000, and if conditions with us will permit, are to keep 30% with you, and are privileged to use the balance for reserve purposes."

*Answer of President of Iola Bank.*
"Oct. 3, 1913. . . .
"Your registered letter of October 3d containing twenty-two notes aggregating $12,000.00, together with a list of said notes and a statement regarding

the value of same, has been received and we are crediting your account $12,000.00 on our books. This credit is made with the understanding that we had with your president, Mr. C. G. Ricker, at the time the loan was arranged for, that any of said notes found not satisfactory should be charged back on our books against the credit mentioned above. Kindly acknowledge receipt of this letter and state that the credit as given is satisfactory."

### Reply of Cashier of Yates Center Bank.

"We have received from you letter which you date October 3d, 1913, acknowledging the receipt of our registered letter of 3d inst., with which we sent to you twenty-two notes aggregating $12,000, together with a list of said notes and a statement regarding the value of same, and stating that you have credited our account on your books with $12,000 in conformity with the understanding between the president of your bank, Mr. E. J. Miller, and the president of this bank, Mr. C. G. Ricker, at the time the loan was arranged for—that any of said notes found not satisfactory should be charged back on your books against the credit which you have given us."

We deem this question of sufficient importance to set out herein the foregoing excerpts from the record of the case relied on, although we do not concede that the official report contains any language which is justly susceptible of a construction that all that this court had previously declared concerning the inadmissibility of parol testimony to vary the terms and legal significance of an indorsement had been set at naught by that decision. The Iola bank recovered as for money loaned, and the notes were construed as collateral security for the loan, notwithstanding their formal indorsement, not because of a parol agreement, but because of an agreement conclusively established by written documents—the written correspondence of the parties. This distinction between the Iola-Yates Center bank case and the present one is obvious and fundamental. Whatever may have been lacking to cover all the details of a completely written contract in that case, enough was shown by the correspondence to prove the Iola bank's right to charge back any objectionable notes to the Yates Center bank's deposit account, and that the technical relationship of the two banks was that of debtor and creditor. In *Milling Co. v. DeWitt,* 65 Kan. 665, 70 Pac. 647, it was said:

"A commercial indorsement by the payee on a negotiable promissory note and a contemporaneous written agreement limiting the effect of such indorsement are to be construed as parts of one instrument." (Syl. ¶ 1.)

From this it follows that the case of *Bank v. Bank,* 98 Kan. 563, 159 Pac. 403, is no authority whatever for the defense sought to be maintained in this action.

By logic, consistency and precedent, therefore, it seems imperative that we should adhere to the well-established rule of commercial paper, that an indorsement of a negotiable promissory note "without recourse" constitutes a written contract whose legal significance is in no need of testimony to interpret it, and which cannot be varied by oral testimony of a prior or contemporary parol agreement concerning it.

Other matters appearing in the record and briefs need little discussion. The correspondence which passed between the parties, voluminous though it was, gave no intimation of an agreement at variance with the purported legal significance of the indorsements appearing on the White notes in controversy. As to the suggestion that the transfer of the notes was part of a scheme of the two banks to cover up excess loans, this court is committed to the proposition that it will give no countenance to a plea that a *prima facie* regular obligation or transaction was colorable only and made or undertaken solely to deceive the bank commissioner as to the extent of a bank's assets and liabilities. (*Bank v. Watson,* 99 Kan. 686, syl. ¶ 3, 163 Pac. 637; *Bandel v. Shaw,* 115 Kan. 185, 222 Pac. 62; *Bank v. Olson,* post p. 320.) The defense of an implied contract was properly eliminated by the trial court when it set aside the second special finding of the jury, and needs no attention.

The judgment of the district court is reversed and the cause remanded with instructions to enter judgment for plaintiff.